Filed 11/19/25  In re V.A. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re V.A., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>V.A. et al.,<br><br>        Defendants and Appellants. | G065408<br><br>(Super. Ct. Nos. 22DP0995, 22DP0995A)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Julie Anne Swain, Judge. Reversed and remanded, with directions. Request for judicial notice granted.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant V.A.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant V.A.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

The parents of minor V.A. appeal from an order terminating their parental rights and placing V.A. for adoption.[1] The parents contend that (1) the juvenile court wrongly rejected the parental-benefit exception; and (2) an insufficient inquiry was made into V.A.'s Indian ancestry.[2] We reject their inquiry contention but agree the exception should have been applied. We therefore reverse and remand.

FACTS

We have encountered this family before, recently holding the parents established the parental-benefit exception as to V.A.'s older twin sisters. (*In re J.A.* (May 27, 2025, G064724) [nonpub. opn.].)[3] It was undisputed the sisters "would benefit by continuing their contact with their parents." (*Id.* at p. 15.) Moreover, "the evidence pointed consistently toward harm" that outweighed "the modest benefits to be gained through adoption over guardianship in [that] case." (*Id.* at p. 21.)

As for V.A., he lived with the parents for his first 11 months. He first came to the juvenile court's attention the month he was born, based on allegations of substance abuse and domestic violence. The court declined to issue a protective custody warrant. Later, the court found a prima facie

---

[1] The parents share the same initials as V.A. so we refer to them as Mother and Father.

[2] "[W]e use the term 'Indian' throughout to reflect the statutory language" (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1 (*Dezi C.*)) used by the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) and the corresponding California Indian Child Welfare Act (Welf. & Inst. Code, § 224 et seq.; Cal-ICWA), though many reasonably prefer other terms.

[3] We grant Mother's unopposed request for judicial notice of our prior opinion.

showing of failure to protect but allowed V.A. to conditionally remain with his parents. The court ultimately declared V.A. a dependent, vested custody with the parents, and afforded family maintenance services.

At a contested six-month review hearing, the court rejected the Orange County Social Services Agency's recommendation to terminate jurisdiction and ordered maintenance services to continue. The family moved to a new home "assessed to be safe" in July 2023. The Agency supplemented its petition, alleging the parents had "unresolved substance abuse problem[s]." The court issued a protective custody warrant (Welf. & Inst. Code, § 340)[4] and placed V.A. with his sisters in the care of Father's cousin. The court "defer[ed] any findings [on ICWA] and order[ed] the Agency to conduct further inquiries and then present that information to the court in subsequent reports."

Mother consistently visited V.A. after he was detained. The Agency reported she "ha[d] not missed any visits," which "appear[ed] to be going well [with] no real concerns." Mother "attend[ed] conjoint counseling" with Father and reportedly "enroll[ed] in [an] anger management" program. Leading up to the juvenile court's jurisdiction hearing, the Agency recommended continued family reunification services for Mother, who entered a "negotiated disposition" to schedule a selection and implementation hearing (§ 366.26) while continuing to receive services. The court sustained the Agency's supplemental petition allegations and found there were no reasonable means to protect V.A. without removing him from his parents' care. The court ordered continued services for Mother, based on the

---

[4] All undesignated statutory references are to this code.

negotiated disposition, and authorized 15 hours per week of supervised visits. At a contested review hearing, the court found returning V.A. to Mother and Father "would create a substantial risk of detriment to the safety, protection or physical or emotional well-being of the child." The court found Mother had made "moderate" progress in her case plan, terminated her family reunification services, and scheduled a selection and implementation hearing (§ 366.26).

The court denied the Agency's petition to reduce Mother's visitation with V.A. The court found the Agency had not shown new evidence or changed circumstances justifying the reduction. Mother continued to steadfastly visit V.A.—spending all of her authorized time with him from October 2024 through January 2025. Father was incarcerated in November 2024.[5]

After a prima facie hearing, the court scheduled an evidentiary hearing on Mother's request to return V.A. to her custody (§ 388), to coincide with the scheduled selection and implementation hearing (§ 366.26).

At the combined hearing in April 2025, nearly 300 pages of "visitation logs" were admitted as evidence. The court nonetheless denied Mother's request to return V.A. to her custody, finding she had not shown it would "promote the best interests of the child." The court moved on to the selection and implementation hearing.

The parents asserted the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) The court agreed with them that their visitation had been

---

[5] We do not consider Father's authorized eight hours of weekly visitation because his appeal relies on Mother's claim concerning the parental-benefit exception. (See Cal. Rules of Court (CRC), rule 5.725(a)(1) & (f).)

"regular and consistent" and "the child had a substantial positive emotional attachment to the parent." But it also found the attachment "was not the kind . . . that demonstrates . . . the child would benefit from continuing the relationship" and the parents had not "met their burden" to show "that terminating the attachment would be detrimental to the child."

The court found V.A. to be adoptable and terminated Mother and Father's parental rights. The court also concluded that ICWA does not apply, finding a "proper, adequate, and duly diligent" Indian ancestry inquiry had been conducted.

## DISCUSSION

## I.

### THE PARENTS ESTABLISHED THE PARENTAL-BENEFIT EXCEPTION

The parental-benefit exception authorizes a court to select a permanency plan other than adoption when a parent shows three things: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

First, it is undisputed that "each parent" engaged in "regular visitation and contact" with V.A., visiting him consistently. (§ 366.26, subd. (c)(1)(B)(i); *Caden C., supra*, 11 Cal.5th at p. 636.)

Second, on the requirement that "the child has a substantial, positive, emotional attachment to the parent," Mother and Father contend the juvenile court wrongly found V.A.'s attachment to Mother was

5

insufficient to show he "would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.)

We agree with the parents. As they assert, the record shows V.A. had a "far greater connection with [Mother] than simply pleasant visits, or frequent and loving contact," which approximated "two days a week of concentrated bonding time with her son."

The strength of V.A.'s connection with his parents is perhaps best illustrated by his distress when they had to leave visits. For example, an October 2024 visit summary showed that "[a]s [a] visit came to an end, [Mother] and [Father] told [V.A.] transportation was going to take him back and [V.A.] began to cry. [Mother] and [Father] soothed [V.A.] by telling [the child], 'don't cry, it's okay. I love you.'" In November 2024, V.A. was observed running "to [Mother] shouting 'Mom'" and, at the end of other visits, "not want[ing] to leave by continuously saying 'No,'" and "cr[ying] holding on to [Mother]." In December 2024, V.A. was again observed not wanting to let go of Mother; he cried at the end of a visit in January 2025; and in February 2025, a "visit ended with [Mother] carrying [V.A.] to the door as [the child] began to cry and scream. [Mother] hugged and kissed [the child] goodbye as [Mother] said, 'It's okay, it's okay.'"

The social worker's testimony was consistent with the parents' position. She agreed their visits with V.A. were "positive" and that V.A. was able to verbalize that he enjoyed them. The social worker confirmed that even days before her testimony, V.A. had been "affectionate towards" Mother and no concerns were noted.

We reject the Agency's characterization that V.A. "rarely exhibited distress" and "the instances during which the child exhibited any reluctance leaving visits were limited." While it is true not every visit ended

6

in tears, that does not impeach the enduring nature of the parent-child relationship. (See *Caden C., supra*, 11 Cal.5th at p. 632 ["it is not necessary . . . to calibrate a precise 'quantitative measurement'" of the relationship].)

Third, we conclude Mother met her burden to show "that terminating [V.A.'s] attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) "In appropriate cases, the strength of the relationship alone can support a finding that its termination would have a 'destabilizing' effect on the child." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 820.) This case presents "'exceptional circumstances'" (*Caden C., supra*, 11 Cal.5th at p. 631) because the strength of V.A.'s bond to Mother is coupled with the social worker's undisputed testimony that even if legal guardianship had been selected as the permanent plan for V.A., he would have still stayed with his sisters and still "have [had the] stable home" provided by his prospective adoptive parents, who indicated a willingness to "keep [V.A.] in their care" through guardianship.

Based on this record, "the harm from severing the child's relationship with" Mother and Father "outweigh[ed] the benefit to the child of placement in a new adoptive home" (*Caden C., supra*, 11 Cal.5th at p. 632) and the court should have applied the parental-benefit exception. Given the merit of Mother's appeal, the order to terminate Father's parental rights should also be reversed. (See CRC, rule 5.725(a)(1) & (f).)

On remand, the court should conduct a new permanency plan hearing. Unless circumstances have materially changed, the court should order guardianship as the permanent plan.

7

## II.

### THE ICWA INQUIRY WAS ADEQUATE

Finally, we reject the parents' contention that the Agency did not complete its duties of inquiry under ICWA and Cal-ICWA by failing to interview V.A.'s extended family members.

"If a child is . . . initially taken into protective custody pursuant to a warrant described in Section 340, the county welfare department . . . has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, . . . [and] extended family members . . . whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2).) The term "'extended family member'" includes an adult "grandparent, aunt [and] uncle." (25 U.S.C. § 1903(2); accord, § 224.1, subd. (c)(1).) "If the court [or] social worker . . . has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the court [or] social worker . . . shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e).)

Given the ""well-developed record"" on ICWA, ""the court ha[d] relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case."" (*Dezi C., supra*, 16 Cal.5th at p. 1141.) The record presented had documented ICWA inquiries with no less than five extended family members of V.A. who repeatedly disclaimed Indian ancestry and affirmed Mexican heritage, in addition to at least two who did not return the Agency's calls. This was in the context of successive ICWA-020 forms filed by the parents—between the court's protective order for V.A., in July 2023, and the court's termination of

8

Mother's family reunification services in October 2024—that disclaimed Indian ancestry.[6]

The parents contend "[t]he social worker should have *at least attempted* to contact the paternal grandfather and the paternal aunts and uncles, which did not occur here, based on the record." But again, ""the court ha[d] relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case."" (*Dezi C., supra*, 16 Cal.5th at p. 1141.) The multiple extended family members interviewed by the Agency included Y.A., "the sibling of [V.A.]'s late paternal grandmother," who also happened to be married to Mother's uncle. In her interview, Y.A. "affirmed that she kn[ew] both sides of the family well." She specifically "reported that both the child's maternal and paternal grandparents, as well as great-grandparents, were born in Mexico and . . . that none had Native American ancestry."

We reject the parents' assertion that error occurred because "there were numerous extended family members known or available" who were not questioned. The "court's fact-specific determination that an inquiry [wa]s adequate, proper, and duly diligent [wa]s 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C., supra*, 16 Cal.5th at p. 1141; accord, § 224.2, subd. (i)(2).) The parents' record citations show the Agency pursued and obtained consistent

---

[6] After the selection and implementation hearing was scheduled, Mother filed a November 2024 ICWA-020 form that, in her words, "indicated possible Indian ancestry through an unknown tribe." The ""well-developed record"" (*Dezi C., supra*, 16 Cal.5th at p. 1141) shows the Agency discussed Mother's claim in a meeting with her that same month, and Mother did not provide any further information. She does not raise any issue on appeal based on the form.

9

information from multiple extended family members, over a span of years, supporting the absence of a "reason to believe" (§ 224.2, subd. (i)(2)) "further inquiry [wa]s necessary" (*id*, subd. (e)(2)).

## DISPOSITION

The juvenile court's April 3, 2025 order is reversed and this matter is remanded for further proceedings consistent with this opinion.

SCOTT, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

BANCROFT, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.